IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| A.K., the Student, and V.I., the Student's Parent,<br><br>Plaintiffs,<br><br>vs.<br><br>DEPARTMENT OF EDUCATION, STATE OF HAWAII,<br><br>Defendant. | Case No. 21-cv-127-DKW-RT<br><br>**ORDER AFFIRMING THE FEBRUARY 13, 2021 DECISION OF THE ADMINISTRATIVE HEARINGS OFFICER** |

Pursuant to the Individuals with Disabilities Education Act (IDEA), Plaintiffs—an eleven-year-old student (A.K.) and her mother (V.I.)—appeal the administrative hearings officer's (AHO) February 13, 2021 decision that neither (1) *a change in A.K.'s feeding therapy* nor (2) *the removal of A.K.'s communication aide* denied A.K. a Free Appropriate Public Education (FAPE). Because, as explained below, Plaintiffs have failed to carry their burden on appeal, the AHO decision is AFFIRMED.

## STANDARD OF REVIEW

The IDEA requires that states receiving federal education funding provide every disabled child with a FAPE. 20 U.S.C. § 1412(a)(1). A FAPE "consists of

educational instruction specially designed to meet the unique needs of the handicapped child . . . ." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 188–89 (1982). While a FAPE does not guarantee the "absolutely best of potential-maximizing education," *J.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 439 (9th Cir. 2010) (citation omitted), it does require the provision of services "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017).[1]

The principal mechanism by which school districts provide a FAPE is the individualized education program (IEP). *Id.* An IEP review team meets annually to evaluate a student's current progress and then sets out measurable goals and a detailed plan for the year in a written IEP. 20 U.S.C. §§ 1401(9), (14); 1414(d).

If an IDEA recipient believes her school district is not meeting its obligation to provide a FAPE, she can file a due process complaint for resolution by an AHO. *Id.* § 1415(b)(6), (f)(1)(A). Then, if the recipient disagrees with the AHO's decision, she "shall have the right to bring a civil action with respect to the complaint presented . . . in a district court of the United States . . . ." *See* 20 U.S.C. § 1415(i)(2)(A).

---

[1] Defendant State of Hawai'i Department of Education ("HIDOE") receives federal education funding under the IDEA. Dkt. No. 1 ¶ 7. Thus, schools within the HIDOE must provide every qualifying disabled child with a FAPE.

A reviewing district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant relief as the court determines is appropriate." *Id.* § 1415(i)(2)(C). The court must give "due weight" to the AHO's decision and must not "substitute [its] own notions of sound educational policy for those of the school authorities which [it] review[s]." *Hendrick Hudson*, 458 U.S. at 206. Furthermore, the amount of deference owed to the AHO's findings and decision increases when they are thorough and careful and demonstrate "sensitivity to the complexity of the issues presented." *J.W.*, 626 F.3d at 438–39 (citation omitted). The party challenging the administrative decision bears the burden of proof. H.A.R. § 8-60-66(a)(2)(B).

## **RELEVANT BACKGROUND**

A.K. is a disabled child who is eligible for IDEA services. Decision of the AHO ("Decision"), Dkt. No. 12-28 at 11–37, Findings of Fact ("FOF") ¶ 16. Of relevance to this appeal, she receives (1) direct feeding therapy[2] and (2) communication assistance because she is non-verbal and requires an augmentative and alternative communication device (AAC) to communicate.[3] Dkt. No. 32 at 2.

---

[2]A.K. receives the vast majority of her nutrition and hydration from a gastronomy tube. FOF ¶ 24. Feeding therapy helps teach A.K. how to coordinate movements of her oral structure for manipulating and moving food and liquid. *Id.* ¶ 27.
[3]A.K. has a variety of needs and a team of professionals who assist her in additional ways, including physical, occupational, and speech-language therapy. *Id.* ¶ 28.

On May 8, 2020, pursuant to her annual IEP review, A.K.'s IEP was changed with regard to these two services.[4]  *First*, her weekly feeding therapy minutes were reduced from 120 to 45 minutes, while 180 minutes per quarter were added for feeding consultation to include peer group mealtime.[5]  *Id.* ¶ 84.  *Second*, her communication aide was removed.  Previously, she was assigned a 1:1 registered behavioral technician ("RBT"), who administered instructional support and applied behavior analysis ("ABA"), and a 1:1 communication aide, who was responsible for facilitating A.K.'s use of the AAC.  *Id.* ¶¶ 44–45, 82.  The May IEP removed A.K.'s aide and re-assigned AAC duties to her RBT.  *Id.* ¶ 84.

These two changes were made over the objections of V.I., A.K.'s mother.  *See id.* ¶¶ 77, 80.  On June 3, 2020, V.I. filed a due process complaint against HIDOE, claiming that the changes denied A.K. a FAPE.[6]  *See* Decision at 5.  The assigned AHO conducted five days of hearing, on August 11–12, 2020 and December 16–18, 2020.  *Id.* at 6–7.  On February 13, 2021, the AHO issued her decision, finding that the changes did not deny A.K. a FAPE.  *Id.* at 64.

On March 11, 2021, V.I. appealed the AHO's decision by filing a Complaint in this Court.  Dkt. No. 1.  HIDOE answered on May 27, 2021.  Dkt. No. 23.  V.I.

---

[4]The May IEP review meeting spanned two days, May 6, 2020 and May 8, 2020.  *Id.* ¶ 71.
[5]This is an overall services reduction of 495 minutes per quarter (nine school weeks), or an average of 55 minutes per week.
[6]V.I.'s complaint also objected to other changes made in A.K.'s May IEP, but only the feeding therapy and communication aide changes are at issue in this appeal.

filed her Opening Brief on September 22, 2021, Dkt. No. 32, HIDOE filed its Answering Brief on October 29, 2021, Dkt. No. 33, and V.I. filed her Reply on November 23, 2021. Dkt. No. 36. Electing to decide the appeal without a hearing, *see* Dkt. No. 37, this Order follows.

## DISCUSSION

### I. Feeding Therapy Change

#### a. Facts

At the time of A.K.'s May 2020 IEP review, two pediatric speech-language pathologists (SLPs) were responsible for A.K.'s feeding therapy. This Order identifies them as SLP-1 and SLP-2. SLP-1 had been providing A.K. with direct feeding therapy for seven years or since A.K. was three years old. FOF ¶ 12. SLP-2 had worked with A.K. for an unspecified amount of time. *Id.* ¶ 13.

On March 13, 2020, SLP-1 authored a comprehensive written assessment ("Assessment") of A.K.'s progress in oral placement and feeding skills. Dkt. No. 14-3. The Assessment, A.K.'s first in about three years, recommended changes to A.K.'s feeding therapy based on her substantial progress and the goal of encouraging her independence:

> [A.K's] feeding program is recommended to change from 120 min of direct service per week to 45 min of direct service per week. A new consultation service of 180 min per quarter is recommended to be added. These recommendations are based on her progress with goals and current roadblocks of personal preference for participation and internal motivation to complete swallows of food and drink

> consistently. [A.K.'s] strong, emphatic opinions at mealtimes are vital to her long-term success and must be considered when designing her treatment plan. Given her demonstration of skills to consume a variety of food and drink safely, when she presents with the motivation to do so, a revised treatment protocol is warranted. To ensure her continued growth, direct service minutes will focus on specific oral feeding skills in a 1-1 setting. This is outlined in her I.E.P. goal. Consultation service minutes will be used to develop small group peer mealtime opportunities for [A.K.]. Consultation service will support and train staff in developing enriching mealtime activities that foster a positive relationship with food while encouraging feeding skills.

*Id.* at 12.

On March 18 or March 19, 2020, a few days after the Assessment was finalized, HIDOE schools were shut down through the end of the school year on May 28, 2020 due to the COVID-19 pandemic. FOF ¶ 52. On March 19, 2020, SLP-1 informed V.I. that feeding therapy would be suspended during the closure for safety reasons. *Id.* ¶¶ 53, 64. As a result, A.K. did not see a feeding therapist for the remainder of the school year. *Id.* ¶ 65.

On May 6, 2020, the first day of the May IEP review, while in the presence of A.K.'s parents, SLP-1 reiterated her recommendations from the Assessment. *Id.* ¶¶ 72, 75. V.I. objected, arguing that A.K. had regressed during the then seven-week shutdown and that IEP revisions should not be based on pre-COVID progress:

> Due to the disruption of traditional educational services from COVID-19, parents report that at the time of IEP, 5/6/20, [A.K.] is refusing to sit in highchair and refusing to put anything in her mouth that

6

> resembles food and/or liquid. . . . [A.K.] is no longer sucking on/eating ice which has previously been an item she consistently accepted at home.

May IEP, Dkt. No. 14-2 at 45; FOF ¶ 77.

When the IEP review team reconvened on May 8, 2020, the SLPs were not present. *Id.* ¶ 73. After some discussion, the team decided to adopt the SLPs' recommended feeding therapy changes over V.I.'s continued objections. During the discussion, the District Educational Specialist (DES) considered waiting to adopt the changes until A.K. could return to school and have her progress reassessed. Pet. Exh. 4 Audio 05/08/2020 IEP meeting ("May 8 Audio"), 02:14:35–02:20:00 (DES: "I'm comfortable leaving it with what it was before if we put in the clarifications . . . that we're going to reassess when we go back."). But another team member informed the DES that they could not do so without the SLPs' presence. *Id.* The DES asked if the team could send a message to the SLPs to clarify their position, and another team member replied that the SLPs had reiterated their position in an email the night prior. *Id.* ("This is the recommendation that they continued to give."). The team discussed other issues for the next 29 minutes. Then, upon returning to the feeding therapy issue, the DES agreed to adopt the SLPs' recommended changes with the following caveat:

> [W]e are writing the IEP in hope that when we do reconvene, those are the services that will be implemented, that there will be data, and that we will possibly amend the IEP based on how much regression would be noted. . . . I just want to make sure we're really careful how

7

> we word this . . . so if there's a large discrepancy [in A.K.'s progress, then A.K. will receive compensatory minutes]. Either way, if we see that she needs it, she's going to get the service.

*Id.* at 02:49:51–02:55:00. The May IEP report documented the feeding therapy change, the basis for the change, V.I.'s objections, and the DES's caveat.[7]

### b.   V.I.'s Due Process Complaint and the AHO's Decision

In her due process complaint, V.I. argued that the May IEP reduction in feeding therapy minutes was a denial of FAPE because it failed to take into consideration A.K.'s regression during the then seven-week shutdown. Decision at 9, 47. The AHO found otherwise. *Id.* at 50. After acknowledging that A.K. had likely experienced regression during the shutdown, the AHO found that the IEP review team *had* discussed and considered such regression in developing the May IEP but had ultimately adopted "the recommendations of the expert" SLPs, which were based on A.K.'s progress and long-term goals for increasing A.K.'s independence. *Id.* at 47. The AHO found this change did not deny A.K. a FAPE.

---

[7]The May IEP report detailed V.I.'s concerns in a section entitled, "5.6.20 Parental Report." Dkt. No. 14-2 at 45. A separate document, the Prior Written Notice of Department Action (PWN), published on May 13, 2020, stated:

> The team decided to use the data collected from August 2019–March 2020 to guide the new IEP with the understanding that [A.K.] will need to be re-evaluated upon returning to school in order to determine her current baseline/appropriate goals at that time. Parent observations were added into the Present Level of Educational Performance under each section titled "parental report."

FOF ¶ 93.

*Id.* at 48 ("Petitioners did not offer . . . any expert opinion to refute the appropriateness of SLP-[1]'s recommendation."); FOF ¶¶ 68, 79.

        **c.    The AHO did not err in determining that A.K.'s feeding therapy changes did not deny her a FAPE.**

V.I. now appeals the AHO's decision. Dkt. No. 1. She makes two arguments. *First*, she asserts that neither the AHO nor the May IEP team considered A.K.'s pandemic-induced regression in their decisions. Dkt. No. 32 at 15–16 ("The AHO completely ignores the fact that the recommendation for the reduction in direct feeding therapy services was based on the progress that A.K. had made," and "[t]he IEP team failed to consider A.K.'s current levels of performance."). On the contrary, the AHO explicitly noted that the feeding therapy changes were based on A.K.'s pre-COVID progress and that any regression would be reassessed when school resumed. Decision at 44, 47. The team, in other words, heard V.I.—they simply decided the issue against Plaintiffs. They did so in accordance with the recommendations of the subject matter expert, SLP-1, who had provided A.K. with feeding therapy for seven years, who heard V.I.'s concerns on May 6, and who nonetheless maintained her recommendation—which was based on a three-year progress Assessment—in the face of the seven weeks' worth of regression the parents had observed. Dkt. No. 14-2 at 45.

*Second*, V.I. argues that the feeding therapy changes were adopted not because it was what SLP-1 had recommended, but because the SLPs were not

9

present at the May 8 meeting. According to the AHO's findings and this Court's own review, that is not what occurred. It is true that the DES at one point considered deferring the SLPs' recommendations in favor of further observations. May 8 Audio at 02:14:35-02:20:00; Decision at 44. However, after considering the issue—including the fact that the SLPs had heard V.I.'s objections on May 6 and had continued to make the same recommendations in an email on May 7—the DES ultimately decided to adopt the SLPs' proposal, with the caveat that A.K.'s team would monitor her services in light of the reported regression. May 8 Audio at 02:49:51–02:55:00. In short, the Court agrees with the AHO that the team adopted the experts' proposal because they thought it was the wisest choice, not because the SLPs were absent on May 8.

## II. Communication Aide Removal

### a. Facts

A.K. is non-verbal and uses an AAC (an iPad Pro) to communicate. FOF ¶ 19. The AAC is an extremely important tool in A.K.'s life because it is her "voice." *Id.* ¶ 20.

Prior to May 2020, a 1:1 communication aide assisted A.K. in using the AAC. FOF ¶ 48. During A.K.'s May IEP review, her Board Certified Behavior Analyst (BCBA), who supervises the RBTs who work with A.K., recommended that the communication aide be removed to help increase A.K.'s independence. *Id.*

10

¶ 82.  V.I. objected to this change, but the BCBA maintained her recommendation, explaining that an RBT could manage the AAC along with the RBT's other responsibilities, that it was the BCBA's responsibility to ensure that the RBTs could do so, and that A.K.'s use of the AAC had not been harmed in the past by the absence of the aide.  *Id.*  In fact, as the BCBA explained, A.K. averaged 93 points per day (number of times she pressed the AAC) with the help of her aide, and 103 points per day—an improvement—without.  *Id.*

The May IEP review team adopted the change.  *Id.* ¶ 83.  As the May 13, 2020 PWN stated:

> The [communication aide] is no longer warranted now that [A.K.] has a[n RBT] as her 1:1 who can run the communication program to fidelity as determined by the supervising BCBA and SLP. Additionally, the team agreed that [A.K.'s] communication program is focusing on independence[;] we want [A.K.] to be operating the device herself as much as possible now.

*Id.* ¶ 93.

### b.  V.I.'s Due Process Complaint and the AHO's Decision

In her due process complaint, V.I. argued that the removal of the communication aide was a denial of FAPE because it was physically impossible for an RBT to manage the AAC on her own, without sacrificing her other responsibilities.  Decision at 50.  In support, during her due process appeal, V.I. offered testimony from A.K.'s most recent RBT (RBT-Aug) that it was not

possible for an RBT to effectively manage A.K.'s AAC and accomplish the RBT's other responsibilities in the school setting.[8] *Id.* at 51; Dkt. No. 32 at 18.

The AHO decided that the communication aide change did not deny A.K. a FAPE because there was no evidence that removal of the aide "would result in a loss of an educational opportunity or cause a deprivation of an educational benefit for [A.K.] when [A.K.] would still have someone helping her with the AAC device and taking data on her usage." Decision at 53; *see Amanda J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001). In making this decision, the AHO did not consider RBT-Aug's testimony because of the so-called "snapshot rule." *Id.* at 51. The snapshot rule "instructs us to judge an IEP not in hindsight, but instead based on the information that was reasonably available to the parties at the time of the IEP." *Baquerizo v. Garden Grove Unified Sch. Dist.*, 826 F.3d 1179, 1187 (9th Cir. 2016); *see also R.E. v. New York City Dept. of Educ.*, 694 F.3d 167, 186 (2d Cir. 2012) (holding that retrospective evidence that "materially alters" an IEP is not permitted, and courts "should use evidence acquired subsequently to the creation of an IEP only to evaluate the reasonableness of the school district's decisions at the time they were made"). In other words, the AHO found that

---

[8]RBT-Aug did not participate in the May IEP meetings. FOF ¶ 2. She provided services to A.K. in the home starting in May 2020 (through health insurance, unaffiliated with HIDOE) and in the school setting in accordance with the May IEP starting in August 2020. *Id.*

because RBT-Aug's opinions were not available to the May IEP team, that evidence could not be used to challenge the May IEP.  Decision at 52.

### c. The AHO did not err when deciding that the removal of the communication aide did not deny A.K. a FAPE.

V.I. now appeals the AHO's decision, arguing that the AHO misapplied the snapshot rule because hindsight evidence can be used to shed light on the reasonableness of an IEP team's earlier decision.  Dkt. No. 32 at 18 (citing *E.M. v. Pajaro Valley Unified Sch. Dist.*, 652 F.3d 999, 1004–05 (9th Cir. 2011)).

The Court agrees with the AHO that RBT-Aug's testimony cannot be used to retroactively rebut the BCBA's May assertion that RBTs are able to manage the AAC at the same time as their other duties.  *See* Decision at 48.  If RBT-Aug's testimony had been offered in May at one of the two IEP review meetings, it might have been considered by the May IEP review team.  But it was not.  And IEPs should be judged "based on the information that was reasonably available to the parties at the time of the IEP."  *See Baquerizo*, 826 F.3d at 1187.  Presented with credible expert opinion—the BCBA's assertions (1) that her subordinates, the RBTs, can effectively manage the AAC, (2) that it was her responsibility to ensure that they do so without compromise to their other duties, and (3) that A.K.'s progress had not suffered in the past in the absence of the aide—the May IEP team made the reasonable decision to accept the BCBA's recommendation to remove the aide.

Even though it is true that "after-acquired evidence may shed light on the objective reasonableness of a school district's actions at the time the school district rendered its decision," *see E.M.*, 652 F.3d at 1004, RBT-Aug's due process hearing testimony did little to accomplish this.[9] A single RBT's complaint that she could not manage the AAC simultaneously with her other duties does not mean that other RBTs were challenged in the same way. Further, even if RBT-Aug's opinion was considered *and credited*, Plaintiffs have still not addressed the evidence indicating that the removal of the aide resulted in a net educational *benefit* to A.K., not a loss, and therefore no denial of FAPE. Indeed, in discussing the absence of the communication aide, V.I.'s focus appears to be on the extra burden allegedly placed on the RBT; she nowhere even asserts that A.K.'s educational experience has somehow suffered.

//

//

//

---

[9] For example, it does not show that the team should not have relied on the BCBA's opinion.

## CONCLUSION

Because the AHO did not err with respect to the two issues identified by Plaintiffs, the AHO's February 13, 2021 decision is AFFIRMED.

DATED: December 7, 2021 at Honolulu, Hawai'i.



Derrick K. Watson
United States District Judge

---

*A.K., the Student, and V.I., the Student's Parent vs. Department of Education State of Hawaii*, Civil No. 21-00127 DKW-RT; **ORDER AFFIRMING THE FEBRUARY 13, 2021 DECISION OF THE ADMINISTRATIVE HEARINGS OFFICER**